# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

**PROGRESSIVE HEALTH AND REHAB CORP.**, an Ohio corporation, individually and as the representative of a class of similarly situated persons,

    Plaintiff,

v.

**INDEGENE, INC.**, *et al.*,

    Defendants.

Case No. 20–cv–10106–ESK–AMD

OPINION

**KIEL, U.S.D.J.**

    **THIS MATTER** is before the Court on plaintiff Progressive Health and Rehab. Corp.'s motion for class certification. (ECF No. 121.) For the following reasons, plaintiff's motion will be GRANTED.

## I.    BACKGROUND

    Plaintiff filed the class-action complaint on August 6, 2020 alleging violation of the Telephone Consumer Protection Act (TCPA). (ECF No. 1 (Compl.).) Plaintiff alleges that on February 7, 2020, defendants[1] sent an unsolicited fax for participation in a Parkinson's Disease study in which defendants offered $250 per eligible patient. (*Id.* pp. 5, 6.) The fax allegedly was not preceded by consent or permission and did not include opt-out language. (*Id.*)

---

[1] Defendants contend that only defendant Indegene, Inc. sent the fax. (ECF No. 130 (Defs.' Opp'n Br.) p. 12 n. 1.) As the other defendants remain in the case, I use the general term "defendants" here.

Plaintiff immediately filed a "placeholder" motion to certify (ECF No. 4) that was denied without prejudice by District Judge Michael A. Shipp (ECF No. 30).  Deadlines for fact and expert discovery were extended numerous times while this case proceeded in the Trenton Vicinage.  (*See, e.g.*, ECF Nos. 48, 51, 61, 68, 89, 99, 103.)  On March 28, 2024, the case was reassigned to me.  (ECF No. 106.)  Magistrate Judge Ann Marie Donio soon after conducted a status conference and set deadlines for class certification.  (ECF Nos. 110, 111.)  Judge Donio thereafter extended the deadline to move for class certification (ECF No. 120) and the pending motion was filed.[2]

Plaintiff's expert has concluded that the 18,869 error-free transmissions were sent to and received by 18,851 unique fax numbers.  (ECF No. 121–2 (Pl.'s Mot. Exs.) pp. 58, 59.)  Plaintiff seeks to certify "Class A," which is defined as

> All persons or entities who were successfully sent the Fax, on or about February 7, 2020, that states "Medical Record Review of the Impact of Adverse Events Associated with the Use of Current anti-Parkinson's Disease Medications on Patient Clinical Therapeutics and Outcomes

---

[2] I scheduled a motion hearing for June 30, 2025.  (ECF No. 140.)  Thereafter, plaintiff filed a letter seeking to bring to my attention the Supreme Court's recent decision in *McLaughlin Chiropractic Associates, Inc. v. McKesson Corporation*, 145 S. Ct. 2006 (2025).  (ECF No. 141.)  I granted plaintiff's request and later cancelled the motion hearing.  (ECF Nos. 142, 143.)  Plaintiff's letter did not explain the purported significance of *McLaughlin Chiropractic Associates, Inc.*  I presume that it was submitted for the proposition that the Hobbs Act does not prevent a plaintiff from arguing during enforcement proceedings that the Federal Communications Commission's interpretation of the TCPA is incorrect, specifically with respect to the TCPA's application to online fax services.  *See McLaughlin Chiropractic Assocs., Inc.*, 145 S. Ct. at 2012, 2018–19.  I accept this proposition.  Though, without prejudging any future arguments, I find some logic in the argument that the TCPA does not apply to online fax services, this argument is best suited for dispositive motion practice or trial with the benefit of more focused arguments on the issue.  *See Williams v. Jani–King of Phila. Inc.*, 837 F.3d 314, 322 (3d Cir. 2016) ("Although the court must undertake a rigorous analysis at the certification stage and consider some merits-related issues, the class certification stage is not the place for a decision on the merits."); *but see Scoma Chiropractic, P.A. v. Nat'l Spine and Pain Ctrs. LLC*, Case No. 20–00430, 2022 WL 16695130, at *7 (M.D. Fla. Nov. 3, 2022) (finding it necessary at class certification to determine whether the TCPA applies to online fax services).

>   Trajectories in the U.S," and offers an honorarium of $250 per eligible patient.

(ECF No. 121–1 (Pl.'s Mot. Br.) p. 11 (quotation omitted).)

Plaintiff also seeks to certify, in the alternative, "Class B." (*Id.* pp. 11, 12.) Class B's definition is almost identical to Class A's with an added sentence stating: "Excluded from Class B are all persons or entities in Indegene's database to whom Indegene claims it had prior express permission to send fax ads." (*Id.*) Class B excludes approximately 2,800 potential class members from Class A, with the remaining fax numbers purportedly acquired from the databases of the American Medical Association (AMA) and Symphony. (*Id.* pp. 29, 30, Pl.'s Mot. Exs. pp. 21–34 (Ekanathan Dep. Tr.) pp. 24:25–25:20.) Defendants' employees and agents are also excluded from both proposed classes. (Pl.'s Mot. Br. p. 12.) Finally, plaintiff asks that Anderson + Wanca be appointed class counsel. (*Id.*)

## II. STANDARDS AND PARTY ARGUMENTS

### A. <u>Motions to Certify</u>

Every putative class action must satisfy four prerequisites: numerosity, commonality, typicality, and adequacy. *See* Fed. R. Civ. P. 23(a); *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 438 (3d Cir. 2017). Additionally, a class action must also be maintainable under Rules 23(b)(1), (2), or (3). *City Select Auto Sales Inc.*, 867 F.3d at 438. A Rule 23(b)(3) class, as brought here, requires predominance and superiority as well as the ability to be "currently and readily ascertainable based on objective criteria." *Id.* at 438–39 (quoting *Marcus v. BMW of N. Am. LLC*, 687 F.3d 583, 593 (3d Cir. 2012)). Factual determinations supporting certification must be made by a preponderance of the evidence. *See Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 183 (3d Cir. 2019).

3

### B.  The TCPA

Under the TCPA, it is unlawful for "any person within the United States, or any person outside the United States if the recipient is within the United States … to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement …." 47 U.S.C. §227(b)(1)(C).  This prohibition is subject to exceptions, including the sender's established business relationship with the recipient.  *Id.*  A plaintiff may bring an action to enjoin violation of the TCPA, recover the greater of the actual loss from the violation or $500 for each violation, or both.  *Id.* §227(b)(3). Recoveries of up to three times the damages amount are available for willful or knowing violations.  *Id.*

An "unsolicited advertisement" refers to "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.* §227(a)(5).  Therefore, fax advertisements sent with the recipient's prior express invitation or permission do not violate the TCPA.  *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 619 (3d Cir. 2020).  The voluntary provision of a fax number from the recipient to the sender constitutes express consent "if the message relates to the reason the number was provided." *Id.*  Further, whether an advertisement meets the statutory definition of unsolicited is objective and does not depend on the subjective viewpoint of the sender or recipient.  *Robert W. Mauthe MD PC v. Millennium Health LLC*, 58 F.4th 93, 96 (3d Cir. 2023).

### C.  Party Arguments

Plaintiff asserts that there are common questions in this case that may be decided with generalized class-wide evidence, including whether 1) the fax was sent from a facsimile machine or other device to facsimile machines as defined in the TCPA, 2) the fax was an advertisement, 3) defendants were the "senders"

of the fax, 4) proposed class members who were sent the fax to equipment other than standalone facsimile machines suffered concrete injuries, 5) the TCPA regulates unsolicited advertisements sent to equipment other than standalone facsimile machines, and 6) defendants can demonstrate prior express invitation or permission. (Pl.'s Mot. Br. pp. 12, 13.) The first five questions may be answered in the affirmative by common, class-wide evidence or as a matter of law, according to plaintiff. (*Id.* p. 13.) The sixth question is relevant only to certain members of Class A, but not Class B. (*Id.*)

The Rule 23(a) prerequisites are met, according to plaintiff, and counsel meets Rule 23(g)'s standard to serve as class counsel. (*Id.* pp. 20–25.) Furthermore, both classes are ascertainable, common questions of fact and law predominate, and a class action is superior to other means of litigation, satisfying Rule 23(b)(3). (*Id.* pp. 26–33.) Plaintiff specifically highlights the predominance of common questions of law and fact in asserting that defendants are without non-class-wide evidence of consent and their purported evidence of consent from plaintiff's former employee is inadequate. (*Id.* pp. 28–33.) Finally, plaintiff rebuts issues that it predicts defendants will raise, including standing and the TCPA's applicability to devices other than standalone facsimile machines. (*Id.* pp. 33–47.)

Defendants first argue that plaintiff is without statutory standing and is not within the "zone of interest" protected by the TCPA. (Defs.' Opp'n Br. pp. 21–25.) Plaintiff is a "professional plaintiff" that collects faxes for the specific purpose of initiating litigation and drawing revenue, according to defendants. (*Id.* p. 24.) Second, the proposed classes lack commonality as required by Rule 23(a)(2) because defendants obtained the fax numbers from multiple sources and individualized issues of consent exist. (*Id.* pp. 25–27.) This issue is underscored by defendants' position that Dr. Steven Mann,

5

plaintiff's former employee, provided consent to receive fax communications to AMA, one of defendants' sources. (*Id.* pp. 14–16, 27.)

Defendants contend that the classes lack predominance as required by Rule 23(b)(3) for similar reasons. (*Id.* pp. 37–42.) Individualized questions of consent cannot be resolved with class-wide proof. (*Id.*) Predominance is also lacking because it is unclear whether many class members suffered the harm necessary to confer Article III standing and there is no means of knowing how individual members responded to the fax. (*Id.* pp. 44–48.) Finally, returning the Rule 23(a)'s prerequisites, defendants submit that issues concerning plaintiff's statutory standing and potential consent render it atypical of the proposed classes and inadequate to represent them. (*Id.* pp. 32–36.)

### III. DISCUSSION

#### A. Numerosity

Rule 23(a)(1)'s numerosity prerequisite requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Though there is no set minimum plaintiffs required to maintain a class action, Rule 23(a)(1) is generally satisfied if the plaintiff demonstrates that the potential number of plaintiffs is greater than 40. *Susinno v. Work Out World*, Inc., 333 F.R.D. 354, 359 (D.N.J. 2019). Plaintiff asserts that Class A consists of 18,851 members and Class B consists of approximately 16,051 members. (Pl.'s Mot. Br. p. 20.) The Class A figure is supported by a fax log included with plaintiff's expert's report (Pl.'s Mot. Exs. pp. 68–109) and plaintiff subtracts from that same list to form the alternative Class B (Pl.'s Mot. Br. p. 20).

Defendants maintain that plaintiff fails to meet the numerosity requirement due to individualized issues of consent and harm. (Defs.' Opp'n Br. pp. 36, 37.) I find that these arguments are better addressed below and, as detailed below, I will ultimately find these arguments unpersuasive. I am

6

satisfied that the numerosity requirement is met as supported by the fax log. *See Susinno*, 333 F.R.D. at 359 (noting that 25,808 prospective class members were identified by unique telephone numbers in a report).

### B. Commonality and Rule 23(b)(3)

I next turn to commonality. Where, as here, the proposed class is a Rule 23(b)(3) class, Rule 23(b)(3)'s predominance requirement subsumes Rule 23(a)(2)'s commonality requirement. *Somogyi v. Freedom Mortg. Corp.*, 495 F. Supp. 3d 337, 346 (D.N.J. 2020). Because I find that the remaining analysis turns on the predominance issue—namely whether individualized issues of consent predominate—I address the issue now. Rule 23(b)(3), again, requires that the class be currently and readily ascertainable as well as predominance and superiority, meaning that common questions of law or fact predominate and class action is the superior method for adjudication. *Id.* at 346–47.

To begin, I am satisfied that the classes are sufficiently ascertainable and accept plaintiff's representation that class members may be identified using the fax log included with its expert's report. (Pl.'s Mot. Br. pp. 27, 28; Pl.'s Mot. Exs. pp. 68–109.) I further agree with plaintiff that, to the extent that defendants' project database is producible, its numbers may be cross-referenced against the fax log and omitted from Class A to form Class B. (Pl.'s Mot. Br. p. 28.) Of course, the project database has not been produced. Therefore, I conclude that the ascertainability requirement is satisfied by the fax log. *See City Select Auto Sales, Inc. v. David Randall Assocs., Inc.*, 296 F.R.D. 299, 313–14 (D.N.J. 2013) (concluding that the class was ascertainable by way of a list of fax numbers that were successfully sent the advertisement).

Second, defendants' associate vice president testified that the fax was sent to numbers in defendants' own project database as well as those acquired from AMA and Symphony. (Ekanathan Dep. Tr. p. 24:5–12.) Plaintiff's number was acquired from the AMA database. (*Id.* pp. 17:24–18:5.) The associate

7

vice president further testified that defendants relied on AMA and Symphony for consent, defendants assert to have whatever consent AMA and Symphony may have, and he was unaware of any documents confirming consent. (*Id.* pp. 41:4–42:16.) More generally, defendants' contact center associate manager testified that she was unaware of any call or documentation confirming consent with recipients of the fax. (Pl.'s Mot. Exs. pp. 7–17 (Durham Dep Tr.) pp. 54:9–55:4.) Therefore, at least with respect to Class B, this appears to be a purchased-list case. "[W]here the fax sender purchased a contact list from a third-party vendor and made no attempt to seek permission from any of the recipients before sending the fax advertisement, there is a generalized, class-wide manner of proving lack of consent." *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 844 (7th Cir. 2022).

    I am particularly persuaded by the Sixth Circuit's analysis in *Bridging Communities Inc. v. Top Flite Financial Inc.*, 843 F.3d 1119 (6th Cir. 2016). There, the plaintiffs asserted before the district court that the issue of consent was subject to class-wide proof because 1) the relevant faxes were sent to a list obtained from a third party, 2) federal regulations require senders who obtain fax numbers from third parties to "take reasonable steps to verify that the recipient agreed to make the number available for public distribution," and 3) there was testimony that those on the third-party list generally were not contacted to confirm consent. *Bridging Cmtys. Inc.*, 843 F.3d at 1125 (quoting 47 C.F.R. §64.1200(a)(4)(ii)(B)). Upon evidence suggesting that consent was never verified, the Sixth Circuit reasoned that class certification could not be denied upon the defendant's speculation that class members may have otherwise consented. *Id.* Even where there is evidence that a defense will apply to some class members, Rule 23(b)(3) requires only that common issues predominate, not that all issues be common. *Id.* at 1126. "[I]n cases where … a sender 'obtained all of the fax recipients' fax numbers from a single

8

purveyor of such information[,]' there exists a 'class-wide means of establishing the lack of consent based on arguably applicable federal regulations.'" *Id.* (second alteration in original) (quoting *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 327–28 (5th Cir. 2008)). *Bridging Communities Inc.*'s reasoning has been cited within this Circuit. *See KHS Corp. v. Singer Fin. Corp.*, Case No. 16–00055, 2018 WL 4030699, at *5 (E.D. Pa. Aug. 23, 2018) ("[I]n cases where the fax recipients have had no prior interactions with the sender—such as when the sender obtained the numbers by purchasing a list—the question of consent may be a common one and allow for certification.").

*Bridging Communities Inc.* logically applies here insofar as defendants obtained the fax numbers from AMA or Symphony. AMA and Symphony were relied upon for consent and there is no evidence of additional measures taken by defendants to confirm consent. (Durham Dep Tr. pp. 54:9–55:4, Ekanathan Dep. Tr. pp. 41:4–42:16.) The question at this stage is not whether defendants were with or without consent, it is whether that determination will be made using common proof. *See Gorss Motels, Inc.*, 29 F.4th at 845. There is no individualized evidence with which to make individualized determinations.

Defendants' attempt to use Dr. Mann to personify its argument that individualized issues of consent predominate provides little more than a red herring. First, AMA's purported responses to defendants' inquiry concerning Dr. Mann's consent are not in the form of a declaration and are unsworn. (*See* ECF No. 130–5 (Defs.' Ex. D).) Insofar as I may consider hearsay evidence, *see Fuentes v. Super Bread II Corp.*, Case No. 18–06736, 2020 WL 7237942, at *4 (D.N.J. Dec. 9, 2020), AMA's responses to defendants state "that Dr. Mann did not request or authorize a 'no contact' which would have prohibited use of his phone and fax for marketing purposes." (Defs.' Ex. D p. 3.) However, it is not clear at this stage whether a failure to request "no contact" constitutes "prior express invitation or permission." *See* 47 U.S.C. §227(a)(5); *see also Gorss*

9

*Motels, Inc.*, 29 F.4th at 847 ("[T]he FCC has explicitly found that 'negative options,' in which a sender presumes consent unless advised otherwise, are insufficient to prove express permission." (quoting *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 965 (7th Cir. 2020)).

Again, I need not decide here whether prior consent was provided. The inquiry is whether that ultimate question can be answered using common evidence. Even accepting AMA's answers, the census form allegedly completed by Dr. Mann was not retained. (Defs.' Ex. D p. 2.) Thus common evidence—AMA's database—will be relied upon to answer common questions, namely whether recipients whose numbers were in AMA's database provided prior express invitation or permission to receive advertisements from defendants.

Finally, defendants argue that the classes cannot be certified because there are individualized issues of standing and there is no evidence that when other putative class members received the fax, they—like plaintiff—found it to be an annoyance. (Defs.' Opp'n Br. pp. 42–48.) Defendants rely on *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) for the proposition that "a concrete injury is required of each and every one of the prospective class members." (*Id.* pp. 44, 45.) However, *TransUnion* did not address "the distinct question whether every class member must demonstrate standing *before* a court certifies a class." 594 U.S. at 431 n. 4. Post-*TransUnion*, the Third Circuit has found that Article III standing need not be established for absent class members prior to certification. *See Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 155 (3d Cir. 2023); *see also Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452, 459 (3d Cir. 2024) ("In a class action, the class's standing turns on the named plaintiffs' standing.").

*Huber* concluded that the suit raised "a common contention as to every class member—namely, that the form collection letter they all received

10

violate[d the Fair Debt Collection Practices Act]." 84 F.4th at 155–56. Nonetheless, the Third Circuit remanded the case for a determination of how many class members likely possessed standing and the feasibility of receiving individualized evidence, something the district court did not have occasion to consider. *Id.* at 157. This was because, as the court noted, "predominance concerns can arise when unnamed class members must submit individualized evidence to satisfy standing and recover damages." *Id.* at 156.

No such individualized evidence is contemplated here at certification. Plaintiff makes clear in its reply that it "seeks only statutory damages, precluding any individual issues as to Article III standing or damages." (ECF No. 134 p.16.)[3] The TCPA provides for recovery of the greater of $500 per violation or the actual monetary loss caused by a violation. 47 U.S.C. §227(b)(3)(B). Essentially, plaintiff has decided to forego the possibility that actual monetary losses exceed $500 per violation in favor of a pursuit of statutory damages recoverable by virtue of the faxes that were allegedly sent without prior express invitation or permission.

True, Congress's creation of a statutory remedy does not itself render a harm concrete for standing purposes. *See Huber*, 84 F.4th at 153. "[W]hat matters is whether the particular plaintiff has suffered 'any physical, monetary, or cognizable intangible harm traditionally recognized' in common law." *Id.* (quoting *TransUnion*, 594 U.S. at 427); *see also Associated Builders & Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty.*, 81 F.4th 279, 289 (3d Cir. 2023) ("[S]tatutory violations that cause some 'physical, monetary, or cognizable intangible harm' will satisfy courts that the plaintiff has

---

[3] The complaint seeks the greater of the actual monetary loss caused by the alleged violations or $500, plus treble damages. (Compl p.14.) However, "[i]n the context of statutory claims, a putative representative may forego modest compensatory damages and pursue only statutory damages (which often do not require proof of injury) on behalf of the class in order to smooth the path to a finding of a predominance of common questions." 1 McLaughlin on Class Actions §4:30 (21st ed. 2024).

11

been '*concretely harmed* by a defendant's statutory violation.'" (quoting *TransUnion*, 594 U.S. at 427)). Post-*TransUnion* a plaintiff need not have suffered a tangible harm so long as they "demonstrate some other intangible harm that bears a '"close relationship" to a harm "traditionally recognized as providing a basis for a lawsuit in American courts."'" *Midland Credit Mgmt., Inc.*, 617 F. Supp. 3d 249, 253 (D.N.J. 2022) (quoting *TransUnion*, 594 U.S. at 425).

Relevantly, the Supreme Court has explicitly identified intrusion upon seclusion as an intangible harm recognized as providing the basis for lawsuits in American courts. *TransUnion*, 594 U.S. at 425. A court in this District has persuasively found that "receiving unsolicited fax messages is (1) exactly the harm that Congress contemplated in enacting the TCPA and (2) is, like an unsolicited telephone call, closely related to the traditional common law causes of action of nuisance and intrusion upon seclusion." *See Physicians Healthsource, Inc. v. Advanced Data Sys. Int'l, LLC*, Case No. 16–03620, 2020 WL 2764826, at *5 (D.N.J. May 28, 2020); *see also Cabral v. Penske Truck Leasing Co. LP*, Case No. 23–01316, 2024 WL 1916701, at *4 (M.D. Pa. May 1, 2024) (concluding, in the context of robocalls and a motion to dismiss, that an allegation of a TCPA violation was alone insufficient but that allegations that the unsolicited calls caused the plaintiff and class members harm including invasion of privacy and intrusion upon seclusion met the standing requirement). Individualized issues or evidence as to damages thus do not undermine the predominance requirement. *See Somogyi*, 495 F. Supp. 3d at 346–47 (counting "whether statutory damages are recoverable" as among the common questions of law or fact that satisfied Rule 23(a)'s commonality requirement); *Hawk Valley, Inc. v. Taylor*, 301 F.R.D. 169, 184–90 (E.D. Pa. 2014) (concluding that Rule 23(b)(3)'s predominance requirement was met following the plaintiff's

contention that each class member was entitled to statutory damages in the same amount and no individualized damages inquiries would be necessary).

Because I conclude that the ascertainability and predominance requirements are met, I turn last to superiority.  Superiority, again, requires that "the class action is the superior method for adjudication."  *Somogyi*, 495 F. Supp. 3d at 346.  Factors to consider include class members' interest in individually controlling separate actions, the extent and nature of litigation already commenced by class members, the desirability of concentrating litigation in the particular forum, and the likely difficulties of managing the class action.  See Fed. R. Civ. P. 23(b)(3)(A)–(D).

I have not been made aware of any pre-existing suits commenced by other class members.  Furthermore, the potential damages recoverable here are modest, between $500 and $1,500 per violation.  *See* 47 U.S.C. §227(b)(3).  Such a recovery is small when compared to the cost of litigation for an individual class member, while a class action spreads litigation costs and encourages private enforcement of the TCPA.  *See Susinno*, 333 F.R.D. at 363.  Further, a single class action is a far more efficient means of resolving this case as opposed to potentially thousands of individual claims.  *See id.*  I conclude then that a class action is the superior method for adjudication.

I make one final note on the issues of commonality and predominance.  Plaintiff proposes both a Class B of 16,051 class members that is limited to those whose numbers were provided by AMA or Symphony and a Class A of approximately 18,851 that also includes numbers from defendants' project database.  (Pl.'s Mot. Br. pp. 11–13, 20.)  The analysis above concludes that the predominance requirement is met with respect to the AMA and Symphony lists because common evidence will be used to resolve the claims.

I see no reason not to extend this logic to the project database and focus certification on Class A.  The project database has not been produced.

Defendants' associate vice president testified that the fact that a person's fax number is in the database means that they have provided consent to receive faxes.  (Ekanathan Dep. Tr. p. 44:3–9.)  The associate vice president believed that documentation supporting consent to receive fax advertisements existed, but had not seen such documents.  (*Id.* pp. 44:10–15, 47:7–17.)  This belief was premised on defendants' standards and quality management systems and being "pretty sure that these processes are in place, and we are not deviating any of those processes."  (*Id.* p. 44:16–45:14.)  I find that presuming individualized issues of consent here would risk excluding potential class members in response to what is little more than speculation that individualized proofs of consent exist.  *See Bridging Cmtys. Inc.*, 843 F.3d at 1125.  Such evidence has not been produced in discovery.  I will proceed then through the remaining certification analysis with Class A.

### C. **Typicality and Adequacy**

The typicality prerequisite of Rule 23(a)(3) "centers on whether the named plaintiffs' individual circumstances are markedly different or the legal theory upon which the claims are based differs from that upon which the claims or other class members will perforce be based."  *Susinno*, 333 F.R.D. at 360 (quoting *Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 340 (D.N.J. 2018)).  Courts analyze whether 1) the claims of the class representative are generally the same as those of the class in both legal theory and factual circumstances, 2) the class representative is subject to a defense inapplicable to many other members and that is likely to become a major focus of litigation, and 3) the interests and incentives of the class representative align with those of the class.  *Id.*  Adequacy under Rule 23(a)(4) requires 1) counsel to be qualified, experienced, and able to conduct the proposed litigation and 2) the plaintiff to not have interests antagonistic to the class.  *Somogyi*, 495 F. Supp. 3d at 347.  Typicality and adequacy merge and I will consider them together here.  *See id.*

Defendants contend that plaintiff fails to satisfy both the typicality and adequacy requirements. (Defs.' Opp'n Br. pp. 29–36.) Much of defendants' argument is premised on purported individualized consent issues and Dr. Mann's furnishment of plaintiff's fax number that I have rejected above. Additional arguments include plaintiff falling outside the TCPA's zone of interest and its detachment from the day-to-day litigation of this case. (*Id.* pp. 30, 34–36.) I address these arguments in turn.

### 1. The TCPA's Zone of Interest

Defendants' zone-of-interest argument relies heavily on the decision in *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782 (W.D. Pa. 2016). In *Stoops*, the plaintiff testified that she purchased 35 cell phones and added minutes to them so that she could receive more calls to serve as the bases for TCPA lawsuits. 197 F. Supp. 3d at 788, 801–02. The court concluded that even assuming that the plaintiff suffered an injury-in-fact, she lacked prudential standing. *Id.* at 803. This was because she was required to establish that the injury complained of fell within the zone of interest sought to be protected by the statutory provision allegedly violated. *Id.* at 804. It was "unfathomable," according to the court, "that Congress considered a consumer who files TCPA actions as a business when it enacted the TCPA …." *Id.* at 805.

Plaintiff's president and owner testified that plaintiff has filed approximately 10 TCPA class actions during his tenure and that counsel's representation of plaintiff predates his ownership. (ECF No. 130–2 (Yannessa Dep. Tr.) pp. 58:23–59:4, 90:15–91:8.) Plaintiff operates a system in which all faxes are printed and distributed to recipient providers, with "junk" faxes placed in a separate box. (*Id.* pp. 50:14–51:20.) The president and owner reviews the junk-fax box to confirm that they are advertisements and sends approximately 30 of the faxes to counsel every three months to be reviewed for

15

potential litigation. (*Id.* pp. 53:1–10, 56:19–57:3.) Plaintiff has received settlement payments from its prior lawsuits. (*Id.* pp. 97:8–21, 98:5–8.)

Defendants attempt to draw parallels to *Stoops* based on plaintiff's retention of junk faxes and history of TCPA litigation. However, the fact plaintiff has filed other TCPA lawsuits does not evidence that it has sought out unsolicited faxes like the relevant calls in *Stoops*. *See Robert W. Mauthe, M.D., P.C. v. MCMC LLC*, 387 F. Supp. 3d 551, 564 (E.D. Pa. 2019). Significantly, plaintiff's president and owner testified that plaintiff uses its facsimile machine to receive insurance verification forms and send records to attorneys. (Yannessa Dep. Tr. p. 49:4–13.) This is thus not a case, like *Stoops*, in which plaintiff has sought to drum-up an increasing number of unsolicited advertisements. Rather, plaintiff has taken the distinguishable steps of closely monitoring and retaining potentially actionable advertisements and aggressively pursuing its rights. These actions do not remove it from the TCPA's zone of interest. *See Robert W. Mauthe, M.D., P.C.*, 387 F. Supp. 3d at 564–65 (finding no evidence to suggest that the plaintiff sought-out the unsolicited communications and that the annoyance that the plaintiff experienced in receiving unsolicited faxes "place[d him] squarely within the zone of interest Congress meant to protect through the TCPA"); *Zondlo v. Allied Interstate, LLC*, 290 F. Supp. 3d 296, 302 (M.D. Pa. 2018) (noting that there was no evidence to suggest that the plaintiff did anything to increase the number of calls she received).

Plaintiff asserts that it is typical of the proposed classes because 1) they all were subject to the same conduct—being sent an unsolicited fax, 2) all claims are premised on the same legal theory—violation of the TCPA, and 3) plaintiff and class members suffered the same harm of being sent an unsolicited fax advertisement. (Pl.'s Mot. Br. p. 23.) I agree and further conclude that the typicality prerequisite is met. *See Somogyi*, 495 F. Supp. 3d at 347 ("Plaintiffs

and the class both allege they were subject to improper telemarketing calls. Accordingly, the typicality requirement is met.").

### 2. Plaintiff's Involvement in Litigation

On the issue of plaintiff's involvement in the day-to-day aspects of litigation, defendants assert that plaintiff "has shown a complete detachment from the day-to-day management of the lawsuit, and exhibits a lack of knowledge of even the most basic information." (Defs.' Opp'n Br. pp. 34, 35.) This includes the inability to quantify damages it sustained, lack of understanding of settlement discussions, and lack of contact with other potential class members. (*Id.* p. 35.)

"A class representative's knowledge of the litigation need not be extensive." *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 77 (D.N.J. 2019) (finding that the plaintiff satisfied the adequacy standard by having its members testify at depositions, having its members review and discuss pleadings and discovery with counsel, and hiring adequate counsel). As was noted in a TCPA case in this District, "[e]xperience teaches that it is counsel for the class representative and not the named parties, who direct and manage these actions." *City Select Auto Sales, Inc.*, 296 F.R.D. at 316 (quoting *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 832 n.9 (3d Cir. 1973)). The adequacy inquiry is focused rather on whether the class representative's interests are antagonistic to those of the class. *Id.* (finding that the record did not demonstrate a potential conflict between the plaintiff and other class members and noting that junk faxes were a "pet peeve" of the plaintiff's president). Related evidence is not complex. *Id.*

The same arguments that defendants use to support their zone-of-interest argument undercut their adequacy argument. Plaintiff's president and owner collects faxes deemed to be unsolicited advertisements, periodically brings them

17

to plaintiff's attorney, and consults with the attorney to determine whether the advertisements he has identified are actionable under the TCPA. (Yannessa Dep. Tr. pp.56:14–57:18, 101:19–102:5.) This demonstrates both a basic understanding of plaintiff's rights and affirmative efforts to vindicate those rights. Furthermore, plaintiff's president and owner testified that he reviewed the complaint and discovery responses and that plaintiff was prompted to file this lawsuit to represent those whose time and ink are wasted on junk advertising faxes. (*Id.* pp.63:14–21, 94:7–22.) I therefore conclude that plaintiff has demonstrated adequate knowledge of the litigation and does not hold interests antagonistic to the class.

### D. The Adequacy of Counsel

The adequacy inquiry is generally two pronged. *Pollak v. Portfolio Recovery Assocs., LLC*, 285 F. Supp. 3d 812, 844 (D.N.J. 2018). First, there is the question of whether the plaintiff's interests are sufficiently aligned with the interests of the putative class members. *Id.* I have answered that question in the affirmative above. The second prong looks to the qualification of counsel. *Id.* The adequacy of class counsel under Rule 23(g) is considered separately from the adequacy of the class representative. *Id.*

Pursuant to Rule 23(g), unless otherwise provided by statute, a court certifying a class must appoint class counsel. Fed. R. Civ. P. 23(g)(1). The court must consider 1) the work counsel has performed in identifying or investigating potential claims; 2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted; 3) counsel's knowledge of applicable law; and 4) the resources counsel will commit to representation. Fed. R. Civ. P. 23(g)(1)(A). Class counsel is required to "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

Plaintiff submits that counsel has devoted substantial effort in investigating and litigating this case as evidenced by the complaint, discovery responses, depositions and produced witnesses, and retention of an expert who has drafted two reports. (Pl.'s Mot. Br. p. 25.) The firm profile of Anderson + Wanca provides a detailed list of federal and state-court cases in which the firm has been appointed class counsel, many of them TCPA cases. (Pl.'s Mot. Exs. pp. 164–76.) The profile further provides information regarding attorney Wallace Solberg's experience, including in consumer and civil-rights class actions. (*Id.* p. 161.)

Notably, defendants' opposition related to adequacy focuses on the dynamic between counsel and plaintiff as opposed to counsel's qualifications. (*See* Defs.' Opp'n Br. pp. 34–36.) I have rejected these arguments above and am satisfied that Anderson + Wanca meets the requirements of Rule 23(g). *See Li*, 324 F.R.D. at 346 (noting the firms' relevant experience in appointing class counsel); *Pollak*, 285 F. Supp. 3d at 844–45 (same).[4] Anderson + Wanca will therefore be appointed class counsel.

---

[4] Appointment of class counsel shall be limited to Anderson + Wanca. The complaint was filed by attorneys Michael J. Canning and Matthew N. Fiorovanti of Giordano, Halleran & Ciesla along with Ryan M. Kelly of Anderson + Wanca, who had not yet submitted a *pro hac vice* motion. (Compl. p. 15.) Kelly, Wallace C. Solberg, and Patrick J. Solberg each moved for leave to appear *pro hac vice*. (ECF Nos. 11, 94, 112.) Each declared that they were heavily involved in the preparation and prosecution of the case and that Canning, Fiorovanti, or an attorney from their office would serve and file all papers and accept service of papers. (ECF No. 11–1 p. 3, ECF No. 94–2 pp. 2, 3., ECF No. 115 p. 2.) The motions were granted. (ECF Nos. 16, 98, 116.) While this motion was pending, Kelly and Patrick J. Solberg moved to withdraw their appearances. (ECF Nos. 126, 138.) Judge Donio granted the motions in relevant part, leaving Wallace C. Solberg and Giordano Halleran & Ciesla as counsel. (ECF Nos. 127, 139.) The instant motion, while filed by Canning, Fiorovanti, and Kelly does not otherwise mention Giordano Halleran & Ciesla and reference to the qualifications of counsel is limited to Anderson + Wanca. (Pl.'s Mot. Br. pp. 25, 49, 50.) I interpret plaintiff as seeking to have Anderson + Wanca appointed as class counsel and Giordano Halleran & Ciesla appointed as liaison counsel. *See Lauria v. BioSante Pharms., Inc.*, Case No. 12–00772, 2012 WL 1341102, at *1 (N.D. Ill. July 18, 2012) (presuming that the motion to appoint lead counsel also sought to appoint local

## IV. CONCLUSION

For the foregoing reasons, plaintiff's motion for class certification (ECF No. 121) will be GRANTED as to Class A. An appropriate order accompanies this opinion.

                                         */s/ Edward S. Kiel*
                                         EDWARD S. KIEL
                                         UNITED STATES DISTRICT JUDGE

Dated: July 17, 2025

---

counsel as liaison counsel, though it was not expressly stated in the motion). "The experience of proposed local or liaison counsel is generally given less weight than the experience of 'lead' counsel for a given plaintiff cohort, as these attorneys are generally utilized for administrative, rather than substantive purposes." *In re Vanguard Chester Funds Litig.*, 625 F. Supp. 3d 362, 366 (E.D. Pa. 2022). If my interpretation is incorrect, counsel may clarify their arrangement and seek a "further order[] in connection with the appointment." *See* Fed. R. Civ. P. 23(g)(1)(E).